1
2
3
4
5
6
7
8    UNITED STATES DISTRICT COURT
9    SOUTHERN DISTRICT OF CALIFORNIA
10

11   VICENTE AGAPITO VEGA,                Case No.:  14cv1485-LAB (DHB)
                    Plaintiff,
12                                        **REPORT AND RECOMMENDATION**
13   v.                                   **REGARDING CROSS-MOTIONS**
                                          **FOR SUMMARY JUDGMENT**
14
     CAROLYN W. COLVIN.,
15   Commissioner of Social Security      **[ECF Nos. 16, 20]**
                    Defendant.
16
17
18                      **I.   INTRODUCTION**

19        On June 18, 2014, Plaintiff Vicente Agapito Vega ("Plaintiff") filed a complaint

20   pursuant to 42 U.S.C. § 405(g) of the Social Security Act requesting judicial review of the

21   final decision of the Commissioner of the Social Security Administration ("Commissioner"

22   or "Defendant") regarding the denial of Plaintiff's claim for disability benefits.  (ECF No.

23   1.)  On March 2, 2015, Defendant filed an answer and the administrative record ("A.R.").

24   (ECF Nos. 11, 12.)   On May 7, 2015, Plaintiff filed a motion for summary judgment

25   seeking reversal of Defendant's denial and an award of disability benefits, or, alternatively,

26   remand for further administrative proceedings.  (ECF No. 16.)   Plaintiff contends the

27   Administrative Law Judge ("ALJ") "committed reversible error by improperly considering

28   the treating medical opinions."  (ECF No. 16-1 at 2:12-13.)  On June 9, 2015, Defendant

                                          1

filed a cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment. (ECF Nos. 20, 21.) Despite a June 11, 2015 deadline to file a reply, Plaintiff did not file a reply. The Court took the matter under submission on July 13, 2015. (ECF No. 22.)

For the reasons set forth herein, after careful consideration of the parties' arguments, the administrative record, and the applicable law, the Court hereby **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED** and that Defendant's cross-motion for summary judgment be **GRANTED**.

## II. PROCEDURAL BACKGROUND

On February 7, 2012, Plaintiff protectively filed an application for supplemental security income under Title XVI of the Social Security Act, alleging a disability beginning February 27, 2010. (A.R. at 24, 55, 157.) After a June 5, 2012 denial at the initial determination (*id.* at 82-85) and a January 25, 2013 denial on reconsideration (*id.* at 91-96), Plaintiff filed a timely request for hearing before an ALJ. (*Id.* at 97-99.) Following an administrative hearing on October 18, 2013 (*id.* at 36-54), ALJ James S. Carletti denied Plaintiff's application on November 4, 2013, after finding that Plaintiff was not disabled, as defined by the Social Security Act. (*Id.* at 24-31.) In reaching this conclusion, the ALJ determined that Plaintiff suffered from the severe impairment of paranoid schizophrenia, but that his residual functional capacity ("RFC") permitted him to perform a full range of work at all exertional levels but with the following non-exertional limitations: simple and repetitive tasks with no public contact and minimal contact with co-workers and supervisors. (*Id.* at 26-27.) Plaintiff requested review by the Appeals Council. The Commissioner's decision became final on April 23, 2014 when the Appeals Council denied Plaintiff's request for review of the ALJ's November 4, 2013 decision. (*Id.* at 1-3.)

## III. LEGAL STANDARDS

**A.** **Determination of Disability**

To qualify for benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that

can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed or any other substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as "disabled." *Id.*

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

> 1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).
>
> 3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 200, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).
>
> 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).
>
> 5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett*, 180 F.3d at 1098 & n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

**B.    Scope of Review**

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999) (citing *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 599, 601 (9th Cir. 1995)); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence." (citing *Tidwell*, 161 F.3d at 601)).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457 (citing *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1985)). In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985) (citing *Vidal v. Harris*, 637 F.2d 710, 712 (9th Cir. 1981); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." (citing *Andrews*

*v. Shalala*, 53 F. 3d 1035, 1039-40 (9th Cir. 1995))); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary." (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).   However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### IV.  FACTUAL BACKGROUND

Plaintiff alleges he became disabled on February 27, 2010.[1]  (A.R. at 172.)  Prior to his alleged disability, Plaintiff was employed as a general laborer[2] from May 2005 to April 2009, as a sheet metal installer for an air conditioning installation business from May 2004 to December 2004, and as an installation technician for a data wire installation business from September 2002 to May 2003.  (*Id.* at 197.)  Plaintiff claims he is not able to perform in any of his previous employment capacities due to schizophrenia and hypertension.  (*Id.* at 185.)

/ / /

/ / /

/ / /

/ / /

---

[1]     Plaintiff completed a Disability Report (A.R. at 184-192) in which he stated that although he stopped working in April 2009 after being laid off, his mental condition became severe enough to keep him from working on February 27, 2010.  (*Id.* at 185.)

[2]     Plaintiff described his job title as "general labor" in his Work History Report.  (*Id.* at 197.)  However, Connie Guillory, the vocational expert, testified that after reviewing Plaintiff's description of the work he performed, Plaintiff was, in fact, an inventory clerk.  (*Id.* at 51.)

5

**A.**   **Medical Evidence**

    **1.**   **Treating Medical Providers**

        a.   <u>San Joaquin General Hospital</u>

On February 26, 2010, Plaintiff was seen by Dr. Chykeetra Maltbia and others at San Joaquin General Hospital.  Plaintiff's mother brought him to the emergency room after he attempted suicide by stabbing himself in the neck with a foot-long metal rod.  Plaintiff indicated he wanted to kill himself but his first attempt by cutting his wrist was unsuccessful.  Plaintiff stated he thrice stabbed the metal rod into the side of his neck.  Plaintiff's mother informed Dr. Maltbia that Plaintiff had a history of depression but he had not been previously treated by a psychiatrist or physician because Plaintiff refused to take steps necessary to be properly evaluated.  Plaintiff indicated he sometimes suffers from auditory hallucinations (people very angry and screaming) and visual hallucinations (unknown people and strange objects), and he reported suffering from auditory hallucinations when he attempted suicide.  Plaintiff indicated he no longer had suicidal ideation and also did not have homicidal ideation, but he stated he was feeling "down." (*Id.* at 426-429.)

Plaintiff was evaluated on February 27, 2010 by Dr. Abbegail Collantes for a 5150[3] hold, medically and surgically cleared, and transferred to San Joaquin County Behavioral Health Services.  (*Id.* at 431-433.)

        b.   <u>San Joaquin County Behavioral Health Services</u>

Plaintiff was transferred to the Acute Psychiatric Treatment Unit of San Joaquin County Behavioral Health Services on February 27, 2010.  A note from Kathy Hannah of Crisis Center stated:

---

[3]   Section 5150 of the California Welfare and Institutions Code authorizes certain individuals, including peace officers and medical providers, to detain a person in custody for up to seventy-two hours for assessment, evaluation, crisis intervention, or treatment, when that person "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled." CAL. WEL. & INST. CODE § 5150(a).

Called to San Joaquin General Hospital second floor to assess male admitted on 2/26/10 for cut to right side of neck and wrist. Patient now medically cleared. Prior to admit to hospital, patient had not slept for two or more days due to increased auditory hallucinations, telling him he had to die. Family found him outside three days ago in underwear with no shoes, wandering. On evaluation, patient has through blocking, paranoid of others, looks over shoulder, not oriented to date, believes it's 2007. Stabbed and cut self because voices told him to. Patient states, "I want to die". Will not contract for safety. Complains of auditory hallucinations still telling him to die. Psychotic disorder, NOS, 311 Depressive disorder, NOS.

(*Id.* at 372.)

Plaintiff was subsequently examined by psychiatrist Hilary Silver, M.D. Dr. Silver noted Plaintiff's past psychiatric history included a visit to a medical provider, Charles Wood, on April 11, 2008 at which time he had been hearing voices for two years. Dr. Wood diagnosed Plaintiff with psychosis, not otherwise specified, and Plaintiff was sent to "Last Chance for speed and alcohol." Plaintiff did not follow up on that diagnosis until February 27, 2010. Dr. Silver noted that Plaintiff was alert and oriented, and he had decreased speech and movement, dysphoric mood, and very blunted affect. Dr. Silver also noted Plaintiff's thoughts were sparse but coherent, and he was still complaining about auditory hallucinations. Dr. Silver diagnosed Plaintiff with paranoid schizophrenia, polysubstance dependence, and personality disorder not otherwise specified. Plaintiff was placed on anti-psychotic medication following which he showed marked improvement. Plaintiff was prescribed Risperdal and discharged to his mother on March 10, 2010. (*Id.* at 369-376.)

Plaintiff continued treatment at San Joaquin County Behavioral Health Services on a monthly, outpatient basis from April 30, 2010 to June 22, 2010. Over the course of this treatment, Plaintiff was noted to be fairly groomed and appropriately dressed. He cooperated during his interviews, and his speech was clear. Plaintiff presented as euthymic and had a constricted affect. Plaintiff denied suicidal and homicidal ideations and delusions. Plaintiff initially had visual hallucinations of "white lights flying" but he did

not complain of those after his first outpatient visit.  Plaintiff continually complained of auditory hallucinations which "come and go" and range from a "'freeway' sound" to "noise now and then."  On May 27, 2010, Plaintiff felt "depressed, emptiness."  Plaintiff denied any side effects from his medication, but on April 30, 2010 he indicated he had "ran out of pills," and on June 22, 2010, he stated that his medication is "working" but he sometimes forgets to take his medication.  (*Id.* at 358-363, 366-368.)

        c.   <u>Paradise Valley Hospital</u>

On November 5, 2011, Plaintiff was seen by Dr. Samuel Kugel at Paradise Valley Hospital.  Dr. Kugel's notes state that Plaintiff presented "with a history of schizophrenia that once more had been decompensated."  Dr. Kugel noted that Plaintiff was paranoid and that Plaintiff stated, "People are after me.  I can't sleep because they're going to hurt me."  Plaintiff also indicated he was starting to hear voices and he was not taking his psychiatric medication.  Dr. Kugel noted the following mental status examination: "The patient is alert, awake, and oriented to time, place, and person.  Speech is coherent and clear.  The patient is expressing auditory hallucinations.  Delusions with paranoid content are present.  The patient denies harm to self or others.  Insight and judgment are seen as poor.  Memory appears intact."  Dr. Kugel diagnosed Plaintiff with chronic paranoid schizophrenia.  Plaintiff was admitted to Paradise Valley Hospital to prevent self-harm and begin psychopharmacotherapy.  (*Id.* at 305-307.)

        d.   <u>Project Enable</u>

        i.   *Treatment History*

Plaintiff was a patient at Neighborhood House Association's Project Enable, a program funded by the County of San Diego Health & Human Services Agency, from November 14, 2011 to September 24, 2013, roughly on a monthly basis.  (*Id.* at 317-333, 377-415.)  Plaintiff was seen during his initial visit by David F. Flanagan, M.D., at which time Plaintiff had been off his medication for three days with no return of symptoms.  (*Id.* at 332.)

/ / /

8

Plaintiff missed his initial appointment following his psychiatric intake, but he was seen on December 6, 2011 by Dr. Flanagan.  Plaintiff reported some improvement with elimination of all paranoia and improved sleep, but he reported daily auditory hallucinations without commands, "just angry stuff."  Plaintiff denied feeling unsafe or having urges to harm himself.  He requested an increase in his Risperdal which he had previously taken at a higher level with good results.  (*Id.*at 330.)

On December 13, 2011, Plaintiff saw registered nurse Maylie Austria and reported that his medications were helpful and caused no side effects.  Plaintiff also reported visual hallucinations, *i.e.*, "seeing black and white spot floating around."  (*Id.* at 328.)

On December 20, 2011, Plaintiff reported to Dr. Flanagan that he had significant improvement but that he was experiencing low-grade hallucinations, *i.e.,* "whispering voices."  (*Id.* at 327.)  On February 14, 2012, Plaintiff reported to Dr. Flanagan that he experienced "residual auditory hallucinations without commands which can be diminished by turning attention to television or task completion."  (*Id.* at 325.)  On March 13, 2012, Plaintiff reported to Dr. Flanagan "persistent auditory hallucinations without any commands" that are worse when he forgets his morning medication.  Dr. Flanagan noted that "[p]roblems of noncompliance persist."  (*Id.* at 321.)

On March 27, 2012, Plaintiff was seen by registered nurse Marina Duyongco. Plaintiff reported experiencing auditory hallucinations but they were "mild and not bothersome."  (*Id.* at 319.)

On April 10, 2012, Plaintiff reported to Dr. Flanagan "continued gradual improvement with full compliance with his medication."  Plaintiff also reported "reduced auditory hallucinations which are difficult to understand.  There are no commands." Plaintiff also reported "some tingling in [his] forearms after taking the medication."  Dr. Flanagan noted that Plaintiff's mood was "content with no expression of depression or despair.  Associations are in tact [sic].  Thought content showsno [sic] sign of internal stimulation but the patient reports persistent vague hallucinations."  (*Id.* at 318.)  On May 22, 2012, Plaintiff visited Dr. Flanagan and denied auditory hallucinations.  Dr. Flanagan

noted "progressive improvement with no complaints of side effects." (*Id.* at 415.)

On August 14, 2012, Plaintiff visited Dr. Oscar Jaurigue and reported feeling depressed. (*Id.* at 412-413.) Plaintiff also visited Dr. Jaurigue on October 16, 2012, December 10, 2012, and February 4, 2013. (*Id.* at 404-410.)

On April 16, 2013, Plaintiff visited nurse practitioner Christine Johnson and reported intermittent auditory hallucinations but denied visual hallucinations or delusions. (*Id.* at 399-400.) Plaintiff again visited Ms. Johnson on May 21, 2013 with similar symptoms. (*Id.* at 396.) On July 2, 2012, Plaintiff visited Ms. Johnson and denied auditory or visual hallucinations. (*Id.* at 393.) On August 13, 2013, Plaintiff visited Ms. Johnson and reported "increased mood swings/angry outburst. [I]ncreased derogatory [auditory hallucinations] which cause him to be more angry -non-command." (*Id.* at 387-388.) On September 5, 2013, Plaintiff reported to Ms. Johnson that he "continues to hear derogatory [non-command auditory hallucinations,] depressed mood." (*Id.* at 385.)

ii.   *Mental Impairment Residual Functional Capacity Questionnaire*

On September 9, 2013, Ms. Johnson completed a Mental Impairment Residual Functional Capacity Questionnaire.[4] (*Id.* at 377-382.) She noted that Plaintiff had changes in medications over the previous three to four months due to increased symptoms. She noted clinical findings demonstrating the severity of Plaintiff's mental impairment included hallucinations, paranoia, poor concentration, and depressed mood. Ms. Johnson checked the following boxes of a check-the-box list of symptoms: pervasive loss of interest in most activities; decreased energy; blunt, flag, or inappropriate affect; feelings of guilt or worthlessness; mood disturbance; difficulty thinking and concentrating; emotional

---

[4]   Although Ms. Johnson completed and signed the September 9, 2013 Questionnaire, the word "Agree" accompanied by a checkmark is handwritten on the last page. (A.R. 382.) This notation is accompanied by the handwritten name of a Project Enable physician. It is not entirely legible, but it appears to be "Dr. Doug Duvall." While the last name is not entirely clear, it is clear that this doctor's name and license number are not consistent with those of Dr. Flanagan or Dr. Jaurigue.

10

withdrawal or isolation; hallucinations or delusions; motor tension; easy distractibility; memory impairment; and sleep disturbance. (*Id.* at 377-378.)

Ms. Johnson opined that Plaintiff was unable to meet competitive standards in the following areas of mental abilities and aptitudes needed to do unskilled work: maintain regular attendance and be punctual within customary, usual strict tolerances; carry out short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; and deal with normal work stress. Ms. Johnson also opined that Plaintiff was seriously limited, but not precluded, from the following: understand and remember short and simple instructions; maintain attention for two hour segments; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without causing them undue distraction or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions. Ms. Johnson noted that medical findings that support these opinions include poor memory, poor concentration, auditory hallucinations, and distractibility. Ms. Johnson also noted Plaintiff had one or two episodes of decompensation within a twelve month period, each at least two weeks in duration. Ms. Johnson also noted Plaintiff suffered from marked difficulties in maintaining concentration, persistence, or pace. Ms. Johnson opined Plaintiff would be absent from work more than four days per month as a result of his impairments or treatment. Based on these same limitations, Ms. Johnson opined that Plaintiff was unable to meet competitive standards with respect to understanding, remembering, and carrying out detailed instructions; setting realistic goals; dealing with stress of semiskilled and skilled work; and making plans independently of others. (*Id.* at 379-380.)

/ / /

Ms. Johnson also opined that due to Plaintiff's paranoia, auditory hallucinations, distractibility, and poor memory and concentration, he would be unable to meet competitive standards with respect to maintaining socially appropriate behavior, and seriously limited but not precluded from interacting appropriately with the general public; adhering to basic standards of neatness and cleanliness; and travelling in unfamiliar places. She also opined that Plaintiff had limited but satisfactory capacity to use public transportation. (*Id.* at 380.)

Ms. Johnson also opined that Plaintiff had moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistent, or pace; and one or two episodes of decompensation within a twelve months period, each of at least two weeks duration. (*Id.* at 381.)

Ms. Johnson anticipated that Plaintiff's impairments or treatment would cause him to be absent from work more than four days per month. (*Id.* at 382.)

### 2.    Psychiatric Consultative Examination

On January 7, 2013, at the request of the Department of Social Security Disability & Adult Programs, Dr. Gregory M. Nicholson, a board certified psychiatrist, completed a Comprehensive Psychiatric Evaluation.   Plaintiff's chief complaint was depression. Plaintiff indicated he had schizophrenia and he heard voices commanding him to kill himself.  Plaintiff also stated he had experienced paranoia and suicidal thoughts in the past but not recently.   Plaintiff indicated he had attempted suicide once by cutting himself. Plaintiff expressed depressed mood, insomnia, decreased appetite and energy, trouble concentrating, and decreased interest in normal activities.   Plaintiff denied having symptoms related to mania or anxiety disorders.  Plaintiff also indicated he had last worked in 2009 when he was responsible for shipping and receiving in a warehouse, but that he stopped working because of hallucinations. (*Id.* at 351-353.)

Dr. Nicholson diagnosed Plaintiff with psychotic disorder based on Plaintiff's history of hallucinations and paranoia, and depressive disorder based on Plaintiff's history of depressed mood, dysphoric affect, and neurovegetative symptoms of depression, and he

assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55.  Dr. Nicholson opined that from a psychiatric standpoint, Plaintiff's condition was expected to improve within twelve months with active treatment.  Dr. Nicholson concluded that Plaintiff was able to understand, remember, and carry out simple one- or two-step job instructions and do detailed and complex instructions, but that Plaintiff had mild limitations in the following areas: (1) ability to relate and interact with co-workers and the public; (2) maintaining concentration and attention, persistence, and pace; and (3) performing work activities without special or additional supervision.  Dr. Nicholson further opined that Plaintiff was not limited in his ability to accept instructions from supervisors, maintain regular attendance in the work place, and perform work activities on a consistent basis.  (*Id.* at 354-356.)

## B.    The October 18, 2013 Hearing

### 1.    Plaintiff's Testimony

The ALJ held an administrative hearing on October 13, 2013.  (*Id.* at 36-54.) Plaintiff testified at the hearing.  Plaintiff is a high school graduate.  He testified that in the previous fifteen years, he worked as a general laborer for a staffing agency, a sheet metal installer for an air conditioning company, and an installation technician for a data wire company.  Plaintiff testified that at the time of the hearing he was taking Trazodone, Fluoxetine, Risperidone, Benztropine, and Prozac, which were all prescribed to him by Project Enable.  The medications caused Plaintiff to have blurred vision and muscle nerve pain.  The Prozac helped Plaintiff with anger issues.  (*Id.* at 39-42.)

Plaintiff testified his schizophrenia affected his ability to work because he had anger issues, nerve pain, sadness, hopelessness, depression, and unusual thoughts.  Plaintiff also stated he had trouble with his memory and concentration, and he forgets things he just learned.  Plaintiff testified he feels anxiety most of the time which causes him to become scared and nervous.  He also stated he has difficulty being around others because he has delusional thoughts that they are coming after him or talking about him.  Plaintiff testified he hears voices every day and the voices bring him down and tell him to kill himself.

Although he admits to attempting suicide once in 2009, he stated he does not experience suicidal thoughts when on medication.  He also feels sad and hopeless three or four times a day until he takes his medication.  Plaintiff stated he did not believe he was improving since going to Project Enable.  Plaintiff testified that nurse practitioner Christine Johnson was the person Plaintiff normally saw at Project Enable.  (*Id.* at 42-46.)

## 2.    Medical Expert's Testimony

A medical expert, Robert McDevitt, M.D., also testified at the hearing before the ALJ.  (*Id.* at 47-50.)  Dr. McDevitt testified that Plaintiff has been treated for paranoid schizophrenia but that his medical records indicate he turns down support, misses appointments, and loses medication.  However, while on medication, Plaintiff is euthymic and does not suffer many symptoms other than auditory hallucinations.  (*Id.* at 47-48.)

Dr. McDevitt opined that while stable on medication Plaintiff "could do more than he's doing.  But there hasn't been any attempt to rehabilitate him or to get him into any kind of job activity."  Dr. McDevitt noted that Plaintiff has not had a change in medication since he began treatment with Project Enable other than changes to the dosage of Risperdal to counter side effects of the medication.  The most recent dosage of Risperdal was two and one-half milligrams per day, which, according to Dr. McDevitt, "is sort of self-therapeutic in a sense but stable enough."  Dr. McDevitt also stated that he "would suspect that if [Plaintiff] had appropriate treatment he could improve more, but we're stuck again with [Dr. Nicholson's] consultation on January of 2013 that indicates at least a reasonable RFC."  (*Id.* at 48-49.)

Dr. McDevitt opined that Plaintiff could take care of his personal needs and socialize and that "[t]here's no compelling evidence that he has problems with concentration, although that's at least from [Dr.] Nicholson's evaluation that if he don't [sic] get medicated he's another individual who's stable on medicine and -- but hasn't moved beyond taking medication.  He could possibly do some simple repetitive work, non-public of course with his history of -- the hallucinations are not very well."  Dr. McDevitt testified that Plaintiff has not recovered from his illness and has not had much treatment except

14

medications for approximately two years.  (*Id.* at 49-50.)

### 3. Vocational Expert's Testimony

Vocational expert Connie Guillory also testified at Plaintiff's hearing before the ALJ.  Ms. Guillory testified that Plaintiff's prior work experience is described in the *Dictionary of Occupational Titles* as (1) a "cable wiring installer and repair," which involved medium exertion with a specific vocational preparation ("SVP") time of 8, but Plaintiff did not perform the job long enough to obtain that SVP level, so she believed it was probably performed at a semi-skilled, SVP level 4; (2) "sheet metal installer," which involved heavy exertion with an SVP time of 8, but Plaintiff did not perform the job long enough to obtain that SVP level, so she believed it was probably performed as a training, SVP level 4; and (3) "inventory clerk," which involved medium exertion at SVP level 4. (*Id.* at 51.)

The ALJ asked Ms. Guillory to consider a hypothetical claimant with the same age, education, and past work as Plaintiff who is limited to performing simple, repetitive tasks in a non-public work environment with minimal interaction with co-workers and supervisors.  Ms. Guillory testified that such a hypothetical claimant would not be able to perform Plaintiff's past work, but that such a hypothetical claimant could perform "unskilled, non-public, non-production type of positions."  She also testified that a significant number of jobs existed in the national economy that the hypothetical person could perform, including packager, cleaner, and laundry worker.  (*Id.* at 52.)

Plaintiff's counsel asked Ms. Guillory whether the hypothetical claimant could perform any of these jobs if the person were to miss four or more days of work per month, and she responded that he would not be able to sustain competitive employment given that additional information.  (*Id.* at 53.)

### C. <u>The ALJ's Findings</u>

### 1. Step One

After consideration of all the evidence, the ALJ concluded that Plaintiff has not been under a disability, as defined by the Social Security Act, from February 7, 2012, the date

Plaintiff's application was filed.  (*Id.* at 30.)  Specifically, at step one of the sequential evaluation process, the ALJ concluded Plaintiff has not engaged in substantial gainful activity since February 7, 2012.  (*Id.* at 26.)

### 2.      Step Two

At step two, the ALJ concluded Plaintiff has the following severe impairment: paranoid schizophrenia manifested by paranoia and sleep disturbance.  (*Id.*)  The ALJ noted that when Plaintiff is not taking his medications he experiences auditory hallucinations and delusions with paranoid content, but when he is compliant with his medications the progress notes document improvement of symptoms, sleep, and mental functioning.  (*Id.*)

### 3.      Step Three

At step three, the ALJ concluded Plaintiff does not have an impairment or combination of impairments that meet or exceed the impairments contained in the Listing of Impairments.  In assessing whether Plaintiff satisfies the "paragraph B" criteria with respect to the severity of his mental impairments, the ALJ concluded Plaintiff's mental impairments did not result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration.  The ALJ also concluded that no evidence establishes the presence of "paragraph C" criteria.  (*Id.* at 26-27.)

### 4.      Residual Functional Capacity

Prior to considering step four, the ALJ determined Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: (1) simple and repetitive tasks; (2) no public contact; and (3) minimal contact with co-workers and supervisors.  In making this assessment, the ALJ concluded Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's symptoms (including paranoid schizophrenia), but Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible.  (*Id.* at 27.)

First, the ALJ found Plaintiff had been persistently non-compliant with prescribed medications and scheduled medical appointments.  Further, Plaintiff had turned down offers of support, such as group therapy, which weighed against Plaintiff's sincerity of his allegations of severe impairment.  (*Id.*)

Second, the ALJ noted that when Plaintiff was compliant with his medications, the objective medical evidence showed the medications were relatively effective in controlling Plaintiff's symptoms.  The ALJ also noted Plaintiff's residual auditory hallucinations could be attenuated or diminished, or even completely resolved, by directing Plaintiff's attention to television or task completion.  (*Id.*)

Third, the ALJ also found that the weight of the evidence did not support Plaintiff's claimed disabling limitations to the degree Plaintiff alleged.  The ALJ noted that Plaintiff had not generally received the type of medical treatment expected for a totally disabled individual, and Plaintiff's course of treatment since his alleged disability onset generally reflected a conservative approach.  (*Id.*)

Finally, the ALJ found that Plaintiff's allegations of significant limitations were not borne out of his description of his daily activities.  Plaintiff was independent in his daily living activities and lived alone, even though at the time of the hearing Plaintiff lived with a friend.  The ALJ also noted that none of Plaintiff's physicians had opined that he was totally and permanently disabled from any kind of work.  (*Id.* at 27-28.)

With respect to the opinion evidence, the ALJ gave little weight to nurse practitioner Johnson's September 9, 2013 assessment.  The ALJ stated that, by regulation, nurses and social workers are not acceptable medical sources, and their diagnoses are insufficient to establish a medically determinable impairment at step two.  As such, their opinions are evaluated as "other medical" opinions and are never entitled to controlling weight.  Rather, the ALJ stated that such an opinion "is entitled only to such weight as is warranted after consideration of multiple factors including testing and consultative evaluations by specialists; supportability, including the degree of explanation and support by objective evidence; consistency with the record as a whole; degree of specialization in the area of

medicine involved; other factors, including awareness of other evidence in the record, and understanding of social security disability programs and requirements." The ALJ stated that although he did not ignore Ms. Johnson's opinion, he did not give it much weight because it was contradicted by progress notes showing Plaintiff's symptoms were stable as long as he was compliant with prescribed therapy and he stays clean and sober. The ALJ also noted that Plaintiff turned down offers of support such as group therapy. Further, the ALJ found that Ms. Johnson's opinion was undermined by the findings and opinions of consulting psychiatrist, Dr. Nicholson. Dr. Nicholson evaluated Plaintiff on January 7, 2013, conducted a complete mental status examination, and presented a detailed report in the required format. Thus, the ALJ rejected Ms. Johnson's opinion. (*Id.* at 28.)

The ALJ also considered the opinion Dr. McDevitt, the medical expert that testified during the hearing, and gave it significant weight. The ALJ noted: (1) Dr. McDevitt is board-certified in psychiatry and had the opportunity to review the entire record and hear Plaintiff's testimony; (2) Dr. McDevitt's opinion took into consideration Plaintiff's history of schizophrenia with periods of non-compliance with prescribed treatments resulting in the exacerbation of symptoms contrasting with stability when Plaintiff is compliant with prescribed therapy; (3) Dr. McDevitt noted that Plaintiff's medications had not been changed in years; and (4) Dr. McDevitt's opinion was consistent with other opinions in the record, including that of Dr. Nicholson. In sum, the ALJ gave Dr. McDevitt's opinion significant weight. (*Id.* at 28-29.)

The ALJ concluded that Plaintiff's RFC assessment was supported by evidence of paranoid schizophrenia that is stable as long as Plaintiff is compliant with prescribed medications and, when compliant, Plaintiff is able to perform simple and repetitive tasks, subject to the additional restrictions to avoid public contact and have limited co-worker and supervisor interaction. (*Id.* at 29.)

**5. Step Four**

At step four of the sequential evaluation process, the ALJ credited the vocational expert's testimony that Plaintiff is unable to perform any of his past relevant work, either

1   as actually done or as generally done in the national economy.  The ALJ also found that

2   Plaintiff has no transferable job skills.  (*Id.*)

3       **6.**    **Step Five**

4       The ALJ considered Plaintiff's age, education, work experience, and RFC, and

5   found that there are jobs that exist in significant numbers in the national economy that

6   Plaintiff can perform.  The ALJ noted that Plaintiff's ability to perform work at all

7   exertional levels was compromised by non-exertional limitations.  The ALJ concluded

8   Plaintiff would be capable of making a successful adjustment to other work that exists in

9   significant numbers in the national economy, including occupations such as a weigher/hand

10  packer, cleaner, and laundry worker.  (*Id.* at 30.)

11      Therefore, the ALJ found that Plaintiff was not disabled as defined by the Social

12  Security Act.  (*Id.*)

13  

**V. DISCUSSION**

14      In his motion for summary judgment, Plaintiff contends the ALJ "committed

15  reversible error by improperly considering the treating medical opinions."  (ECF No. 16-1

16  at 2:12-13.)  Plaintiff contends the ALJ failed to articulate a legally sufficient rationale for

17  rejecting the treating opinion from Project Enable.  (*Id.* at 3:6-9.)  Specifically, Plaintiff

18  contends the ALJ's opinion was required to set forth specific and legitimate reasons

19  supported by substantial evidence in the record in order to reject the opinions of nurse

20  practitioner Johnson from Project Enable.  (*Id.* at 3:14-4:21.)  Plaintiff further contends the

21  ALJ improperly rejected Ms. Johnson's opinions because, although she is a nurse, her

22  opinions were reviewed and approved by a medical doctor.  (*Id.* at 4:22-5:2.)  Plaintiff also

23  contends that the error is material because the vocational expert testified during the hearing

24  that an individual assumed to be absent for four or more days per month (*i.e.*, Ms. Johnson's

25  opinion as to Plaintiff) would be unable to sustain competitive employment.  (*Id.* at 5:22-

26  6:3.)

27      As discussed below, Plaintiff's argument that the ALJ was required to set forth

28  specific and legitimate reasons for rejecting Ms. Johnson's September 2013 opinions is

19

based on a misunderstanding of the relevant case law and Social Security regulations.

It is true that the opinion of a treating physician is generally entitled to deference. *See* 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . ."); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987))); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987))). Moreover, "where [a] treating doctor's opinion is not contradicted by another doctor, it may be rejected only for 'clear and convincing' reasons." *Lester*, 81 F.3d at 830 (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)). However, "if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

These principles, however, pertain to the deference accorded treating physicians. Here, Ms. Johnson is not a treating physician; rather, she is a nurse practitioner. Nurse practitioners are not considered "acceptable medical sources" under 20 C.F.R. § 416.913.[5]

---

[5]      "Acceptable medical sources" include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 416.913(a)(1)-(5). The Commissioner "need[s] evidence from acceptable medical sources to establish whether [a claimant] ha[s] a medically determination impairment(s)." 20 C.F.R. § 416.913(a).

Instead, nurse practitioners are considered "other sources." *See* 20 C.F.R. § 416.913(d)(1) (listing medical sources that are considered "other sources," including nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists). Thus, Ms. Johnson's opinions are not entitled to special weight. The ALJ may reject the opinions of "other sources" by giving "reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

Plaintiff contends that although Ms. Johnson is a nurse practitioner, the form containing her opinions clearly indicates that it was reviewed and agreed with by a medical doctor. In so doing, Plaintiff relies on *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228 (9th Cir. 2011), in which the Ninth Circuit recognized that "nurse practitioners are listed among the examples of 'medical sources'" contained in the regulations. *Taylor*, 659 F.3d at 1234. The Ninth Circuit then found that "[t]o the extent [the] nurse practitioner . . . was working closely with, and under the supervision of [the doctor], her [*i.e.*, the nurse practitioner] opinion is to be considered that of an 'acceptable medical source.'" *Id.* (citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)). This finding was based on the Ninth Circuit's prior decision in *Gomez*, which involved a nurse practitioner, Debra Blaker, which had consulted with the treating doctor, Dr. Kincade, regarding Gomez's treatment "numerous times over the course of her relationship with Gomez. NP Blaker worked closely under the supervision of Dr. Kincade and she was acting as an agent of Dr. Kincade in her relationship with Gomez. Her opinion was properly considered as part of the opinion of Dr. Kincade, an acceptable medical source." *Gomez*, 74 F.3d at 971.

Here, there are no opinions from any of the physicians at Project Enable that Ms. Johnson's opinion could properly be considered a part of. Moreover, there is no evidence in the record suggesting that Ms. Johnson consulted with or worked closely under the supervision of any of the Project Enable physicians, let alone the doctor that agreed with her September 2013 report. In fact, as noted above, *see supra* note 4, although Ms. Johnson's opinion contains a handwritten note from a doctor expressing agreement with

her report, it is unclear who this doctor was.  What is clear is that this doctor was neither Dr. Flanagan nor Dr. Jaurigue, the two doctors at Project Enable that had also treated Plaintiff.  Thus, the principle set forth in *Gomez* and *Taylor* that a nurse practitioner's opinions may be considered as part of a treating physician's opinion based on that physician's close supervision with the nurse practitioner does not apply in this case.  *See Farnacio v. Astrue*, No. 11-CV-065-JPH, 2012 U.S. Dist. LEXIS 130913, at *18-19 (E.D. Wash. Sept. 12, 2012) (finding *Gomez* inapplicable where "there is no evidence that [physician's assistant] consulted with or worked as closely with any other physician as the evidence reflected in *Gomez*.")

The *Gomez* decision was also based on the Ninth Circuit's reading of 20 C.F.R. § 416.913(a)(6), which at the time of the decision provided that "[a] report of an interdisciplinary team that contains the signature of an acceptable medical source is also considered acceptable medical evidence." *Gomez*, 74 F.3d at 971.  The Ninth Circuit went on to state that "[w]hile nowhere in the regulations is the term 'interdisciplinary team' expressly defined, a plain reading . . . indicates that a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Id.*  However, as numerous district courts in the Ninth Circuit have recognized, both before and after *Taylor*, the regulation relied on in *Gomez* regarding "interdisciplinary teams" involving "other sources" such as nurse practitioners and physician assistants has since been amended, and "interdisciplinary teams" are no longer considered "acceptable medical sources."  *See, e.g.*, *Harrison v. Comm'r of Soc. Sec. Admin.*, No. 3:13-cv-8177-HRH, 2014 U.S. Dist. LEXIS 52623, at *17-18 (D. Ariz. April 16, 2014) ("[T]here is nothing in the record that indicates that Dr. Sadowski supervised [physician assistant] Barnes or was involved in plaintiff's mental health treatment in any way.  Dr. Sadowski's signature on the mental capacities form does not transform Barnes' opinion into evidence from an 'acceptable medical source' because the opinion was based on Barnes' treatment of plaintiff, not Dr. Sadowski's treatment of plaintiff." (citing *Garcia v. Astrue*, No. 1:10-CV-00542-SKO, 2011 U.S. Dist. LEXIS

98299, at *15 (E.D. Cal. Sept. 1, 2011) (doctor's signature on reports authorized by physician assistant did not transform reports into evidence from an "acceptable medical source" when the physician assistant prepared the reports following his examination of claimant))); *Wellington v. Colvin*, No. 1:11-cv-00008-REB, 2014 U.S. Dist. LEXIS 45786, at *22-25 (D. Idaho Mar. 31, 2014) (rejecting argument that opinion of physician's assistant working in conjunction with physician constitutes "acceptable medical source" and stating that "[a]lthough the Court recognizes that there are good reasons for recognizing the opinion of a physician's assistant who provides regular treatment to a patient, the regulations at this time do not *require* an ALJ to treat a physician assistant's medical opinion the same as that of a treating physician."); *Curtis v. Colvin*, No. CV 12-00396-TUC-JGZ (DTF), 2014 U.S. Dist. LEXIS 20510, at *15-16 n.3 (D. Ariz. Jan. 24, 2014) ("[T]he *Gomez* rationale was based on a regulatory provision that was repealed in 2000."); *Olney v. Colvin*, No. 12-CV-0547-TOR, 2013 U.S. Dist. LEXIS 122105, at *10-11 (E.D. Wash. Aug. 27, 2013) (recognizing that, following 2000 amendment to 20 C.F.R. § 416.913(a), *Gomez*'s conclusion that a physician assistant who works in conjunction with a physician constitutes an acceptable medical source "is no longer good law."); *Casner v. Colvin*, 958 F. Supp. 2d 1087, 1097 (C.D. Cal. 2013); *Farnacio*, 2012 U.S. Dist. LEXIS 130913, at *6 ("The subsection of the regulation which was the basis of the *Gomez* finding regarding nurse practitioners as acceptable medical sources when part of an interdisciplinary team was deleted by amendment in 2000.  65 Fed. Reg. 34950, 34952 (June 1, 2000). . . . There is [currently] no provision for a physician assistant to become an acceptable medical source when supervised by a physician or as part of an interdisciplinary team." (citation omitted)); *Hudson v. Astrue*, No. CV-11-0025-CI, 2012 U.S. Dist. LEXIS 154871, at *13 n.4 (E.D. Wash. Oct. 29, 2012) (recognizing that regulations underscoring *Gomez* finding "have been amended since the *Gomez* decision, and the Commissioner no longer includes 'interdisciplinary team," under the definition of acceptable medical sources."); *Reynolds v. Astrue*, No. CV-09-0213-CI, 2010 U.S. Dist. LEXIS 92701, at *21 (E.D. Wash. Sept. 3, 2010).

The Court agrees with the conclusions of the many courts that have considered *Gomez*'s continuing validity in light of the 2000 amendment to 20 C.F.R. § 416.913(a). Accordingly, the Court finds that Ms. Johnson's September 2013 report does not rise to the level of an "acceptable medical source" due to the handwritten note of agreement from an unidentifiable physician.[6]   As a result, the ALJ was only required to identify germane reasons for not fully crediting Ms. Johnson's assessment, and the ALJ satisfied this requirement.

In his opinion, the ALJ gave the following reasons for disregarding Ms. Johnson's assessment:

> While I have not ignored the opinion of Ms. Johnson, I have not given it much weight.  Her opinion is contradicted by progress notes showing stability of the claimant's symptoms and improvement of functioning as long as he is compliant with the prescribed therapy and stays clean and sober.  It is also noteworthy that the claimant has turned down other offers of support such as group therapy.
>
> Her opinion is undermined by the findings and opinions of consulting psychiatrist Gregory Nicholson, M.D., who evaluated the claimant on January 7, 2013 (Exhibit 7F).  He conducted a thorough examination of the claimant including a complete mental status examination, required by the Regulations and presented a report in the format and with the detail also required.  For the foregoing reasons, I reject the opinion of Ms. Johnson.

(A.R. 28.)

---

[6]      In an effort to convince the Court otherwise, Plaintiff cites to a California regulation requiring that a physician assistant be supervised by the physician.  *See* 16 CAL. CODE REGS. § 1399.545.  Plaintiff argues this state requirement "compels the conclusion that the physician assistant's expressions are imputed to the physician absent repudiation by the licensed physician." (ECF No. 16-1 at 5:19-20.)  However, this regulation is, by its terms, applicable only to physician assistants.  Plaintiff has not cited, nor has the Court found, any parallel supervision requirement applicable to nurse practitioners, or any authority extending the supervision requirement for physician assistants to the acts of nurse practitioners such as Ms. Johnson.  Moreover, even if the state required supervision of nurse practitioners, the record in this case does not demonstrate such supervision occurred.

Inconsistency with medical evidence is a germane reason sufficient to permit an ALJ to reject "other source" opinions.  *See Lewis*, 236 F.3d at 511.  Further, factors used to evaluate the weight of a nurse practitioner's opinion include, among others, the degree of explanation and support by objective evidence and understanding of social security disability programs and requirements.  20 C.F.R. § 416.927(d).  Thus, the ALJ's decision to give more weight to Dr. Nicholson's opinion than to Ms. Johnson's opinion is another germane reason.  In short, the Court finds substantial evidence in the record supporting the ALJ's reasoning.

Moreover, even if the ALJ was required to set forth specific and legitimate reasons for rejecting Ms. Johnson's report, as Plaintiff urges, the ALJ satisfied this heightened requirement when specifically describing the inconsistencies between Ms. Johnson's report and her progress notes.  *See Jones v. Colvin*, No. 1:12-cv-1283- BAM, 2013 U.S. Dist. LEXIS 143425, at *16 (E.D. Cal. Sept. 30, 2013) ("The Ninth Circuit has found that when a doctor's conclusions are not consistent with his own findings, that is a specific and legitimate reason for rejecting that opinion." (citing *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986) (per curiam))).

For these reasons, the ALJ properly rejected Ms. Johnson's assessment.

## V. CONCLUSION

After a thorough review of the record in this matter, and based on the foregoing analysis, this Court **RECOMMENDS** Plaintiff's motion for summary judgment be **DENIED** and Defendant's cross-motion for summary judgment be **GRANTED**.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d).

IT IS HEREBY ORDERED that **no later than November 30, 2015**, any party may file and serve written objections with the Court and serve a copy on all parties.  The documents should be captioned "Objections to Report and Recommendation."

/ / /

14cv1485-LAB (DHB)

IT IS FURTHER ORDERED that any reply to the objections shall be filed and served **no later than ten days** after being served with the objections.

The parties are advised that failure to file objections within the specific time may waive the right to raise those objections on appeal of the Court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: November 12, 2015

DAVID H. BARTICK
United States Magistrate Judge

26